# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. DERRICK SLOAN TAYLOR

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2249     Mark J. Fishburn, Judge**

---

### No. M2010-00571-CCA-R3-CD - Filed June 10, 2011

---

The Defendant, Derrick Sloan Taylor,  was convicted by a Davidson County Criminal Court jury of felony murder, second degree murder, and especially aggravated robbery, a Class A felony.  See T.C.A. §§ 39-13-202 (Supp. 2007), 39-13-210 (2010), 39-13-403 (2010).  The trial court merged the convictions for felony murder and second degree murder and sentenced the Defendant as a Range III, multiple offender to life for felony murder and to forty years' confinement for especially aggravated robbery, to be served concurrently with each other and consecutively to the Defendant's sentence in another case.  On appeal, he contends that the evidence was insufficient to support his convictions and that the trial court erred by admitting evidence of prior bad acts.  We affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Derrick Sloan Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sarah Davis and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the robbery and shooting death of the victim, Vincent Thomas, during a drug transaction.  At the trial, Nashville Fire Captain Jesse Adcox testified that he was on duty the night of April 5, 2007.  He stated that at about 11:10 p.m., a black man rang the emergency buzzer and said his friend was bleeding on North Second Street and needed help.  He said the man stated he did not know why his friend was bleeding.  He said he called

dispatch to inform them of the emergency, gathered the firemen at the station, and went to the intersection of North Second Street and Vaughn Street. He said that the man disappeared as he gathered the other firemen and that he never saw the man again. He said he arrived at the intersection and found the victim lying face down on the ground. He said the victim had been shot, was not breathing, and did not have a pulse. He said that officers performed CPR and that the victim was rushed to the hospital.

On cross-examination, Captain Adcox testified that it took him approximately three or four minutes to arrive at the scene after the unidentified man rang the emergency buzzer at the fire station. He said no one other than the victim was at the scene when he arrived.

Metro Police Sergeant Jason Proctor testified that he responded to a shooting at North Second Street on April 5, 2007. He said paramedics and other officers were securing the scene when he arrived at approximately 11:20 p.m.

Metro Police Officer George Bouton testified that he was a crime scene investigator. He said that he responded to a shooting at North Second Street on April 5, 2007, and that other officers were securing the scene when he arrived. He said he took photographs of the scene and searched for evidence using a metal detector. He identified numerous photographs of the scene. He said that he did not find a weapon or shell casings and that the lack of casings indicated that a revolver might have been used or that the casings were collected after the shooting.

On cross-examination, Officer Bouton testified that he did not find shell casings or other ballistics evidence at the scene. He agreed that there could be multiple explanations for why casings would not be found and that he did not know why casings were not found at the scene.

Chad Pennington testified that he formerly worked as a bartender at the Aquarium restaurant with the victim. He said he worked with the victim for two years and knew the victim well. He said he and the victim worked the night of the victim's death. He said the victim made over $200 that night and was in a good mood. He said that two of the victim's friends, a white male named Justin and a white female, gave the victim a ride home that night and that they previously gave him rides home from work because the victim did not have a car. He said the victim and his two friends left the restaurant a little after 10:00 p.m.

Eric Shanklin testified that he was the assistant general manager at the Aquarium restaurant and that he worked there with the victim on April 5, 2007. He said that the victim made over $300 that night and that the victim asked him to exchange the victim's twenty-dollar bills for hundred-dollar bills to allow the money to fit in the victim's wallet. He said

that he noticed the victim had a couple thousand dollars in his wallet and that he asked the victim why he had so much money in his wallet. He said the victim informed him that he had the money because he intended to purchase a car the next day. Mr. Shanklin identified a record from the restaurant reflecting that the victim left at 10:24 p.m. He said he spoke with detectives after the victim's death and provided them with the record.

Justin Hines testified that he and the victim were related by marriage and that he considered the victim and the victim's wife, Misha Thomas, to be his cousins and friends. He said that he saw the victim frequently around the time of his death and that the victim lived on Lucille Street, near North Second Street. He said that the victim worked at Aquarium and that he provided the victim with rides home from work. He said the victim did not own a car but was attempting to purchase one.

Mr. Hines testified that on the night of the victim's death, he and his girlfriend, Elizabeth Spurlock, drove to Aquarium to give the victim a ride home. He said that they stopped at a store on the way to the victim's home in order for the victim to purchase additional minutes for his prepaid cell phone but that he did not go into the store with the victim. He said that they drove to the victim's home and that they arrived fifteen minutes after leaving Aquarium. He said that they entered the home, that the victim asked his wife to add the purchased minutes into their cell phone account, and that she did so and returned the phone to the victim. He said the victim requested a ride "around the corner" after speaking with someone on the cell phone. He said that he did not hear the victim's conversation but that the victim informed him that he wanted to go to North Second Street because "Ty didn't answer the phone." He said that the victim previously purchased drugs from Ty but that the victim was unable to reach Ty that night. He said that the victim wanted a ride to North Second Street to attempt to purchase crack cocaine, that this was not the first time he took the victim to North Second Street to look for drugs, and that he sometimes used the drugs the victim purchased. He said they left the victim's home within five minutes of arriving and without telling anyone where they were going.

Mr. Hines testified that they arrived at North Second Street and that the victim left the car holding his cell phone. He said the victim's phone was turned on when he left the car. He said he remained in the car when the victim walked away with a man who approached the car. He said he lost sight of the victim when the victim walked around the corner and entered a person's yard. He said that he drove away after seeing a car he suspected was driven by an undercover police officer and that he saw two unknown men standing in the road wearing winter clothing as he drove away. He said that he drove around the block but that he was unable to find the victim. He said that several people were on the street when he first arrived

but that the street was empty when he returned to the area where he last saw the victim. He said he returned to the victim's home and told Ms. Thomas that he could not find the victim.

Mr. Hines testified that he, Ms. Spurlock, and Ms. Thomas searched for the victim but were unable to find him. He said that Ms. Thomas used a pay phone to call the victim's cell phone but that the call went directly to voice mail. He said they returned to the area where he last saw the victim and saw a fire engine and the victim lying face down on the sidewalk. He said paramedics worked on the victim and took him away in an ambulance. He said Ms. Thomas was hysterical and collapsed after seeing the victim. He identified a map of the area where the victim was found and indicated where he last saw the victim, where he drove as he searched for the victim, and where the victim's body was found. He agreed he was driving around the block when the victim was shot and said he did not see the victim get shot. He said that he did not hear a gunshot and that he had the car windows up and the radio on.

Mr. Hines testified that he was not truthful with the police that night. He said he did not tell the police he drove the victim to North Second Street. He said he told them that he was in the area searching for the victim because Ms. Thomas asked him to do so after the victim did not come home on time and that he did not know how the victim got home from work. He said he lied to the police because he was scared, did not know what to do, and did not want to get into trouble for helping the victim buy drugs. He said that he eventually told the police the truth after they learned he lied and stated that he was testifying truthfully.

On cross-examination, Mr. Hines agreed that it took fifteen minutes to arrive at the victim's home after they left the Aquarium restaurant, that they were at the victim's home for five minutes before leaving to purchase drugs, and that it took only a few minutes to drive to North Second Street. He said that he did not know the man who approached his car, that he had not seen the man previously, and that he could not hear the victim's conversation with the man. He said that the victim walked toward a nearby home and that he saw people sitting on the porch. He said that he did not look directly at the people but that there were no more than three people on the porch. He did not know their gender and could not identify them. He said he sat in the car for about a minute before seeing the undercover police officer and driving away. He said he did not see the victim or anyone on the porch when he drove away. He said the victim's body was found across the street from the home. He said that he did not see the victim get shot and that he did not hear a gunshot. On redirect examination, Mr. Hines testified that he saw "a few" people on the porch of the home where the victim attempted to purchase drugs but that he did not know how many were there.

Misha Thomas testified that she was married to the victim for fourteen years and that they had three children. She said they lived on Lucille Street, near North Second Street. She said that the victim worked six days per week at the Aquarium restaurant and that the victim

-4-

asked friends for rides to work because his car had transmission problems. She said the victim was saving money to purchase a new car.

Ms. Thomas testified that on April 5, 2007, the victim went to work in the afternoon and returned home around 10:30 p.m. with Mr. Hines and Ms. Spurlock. She said she added minutes onto the victim's cell phone and returned it to the victim. She said she noticed a few minutes later that the victim and Mr. Hines left the home. She said Mr. Hines returned and told her that he could not find the victim and that he left the victim on North Second Street. She said she knew the victim purchased drugs in that area. She said they drove to North Second Street but could not find the victim. She said she called the victim's cell phone but the call went directly to voice mail. She said that they continued to search for the victim and that they saw the victim lying face down on the sidewalk. She said that the fire department was at the scene when she arrived and that the police arrived as paramedics attempted to perform CPR on the victim.

Ms. Thomas testified that she lied when she spoke with the police that night. She said she told the police that she was looking for the victim because he did not come home after work. She said that she did not want her children to know their father was shot while purchasing drugs and that she did not want the police to think the victim was a "junkie." She said the victim was a good father and a hard worker. She said that she was emotional when she spoke with the police and that she did not plan to lie to them. She said Detective William Stewart came to her home two days later and asked her to come to the police station to speak with him because he learned that she lied to him on the night of the victim's death. She said she accompanied Detective Stewart to the station and told him the truth.

Ms. Thomas testified that she and her father drove to Vanderbilt Hospital after the victim was taken there. She said a doctor informed her that they were unable to save the victim because he was bleeding internally. She said the hospital transferred the victim's personal items to the police. She said that Detective Stewart told her what was recovered from the victim and that she noticed the victim's wallet and cell phone were missing. She said the victim always carried a wallet. She said neither she nor the victim knew the Defendant.

Linda Faye Price, the victim's mother, testified that she drove to Nashville after speaking with Ms. Thomas and learning that the victim was killed. She said that Detective Stewart came to Ms. Thomas's home on April 6 and that she received a strange telephone call while he was there. She said a black female called her from the victim's cell phone and asked to speak with Faye on Sutton Street. She told the caller that her name was Faye, but that she lived on Ninth Street in Clarksville, not Sutton Street. She said the caller hung up. On cross-examination, Ms. Price testified that she did not recognize the caller's voice.

Kisa Thomas, the victim's sister, testified that she accompanied her mother to Nashville after learning that her brother was killed. She said that Detective Stewart came to speak with her and her mother and that her mother received a call from the victim's cell phone while Detective Stewart was there. She said that the caller hung up and that she called the victim's phone. She said a black female answered but quickly hung up. She said she did not recognize the female's voice. She said she attempted to call the victim's phone again but there was no answer. On cross-examination, Kisa Thomas testified that although she did not recognize the female's voice, she was positive the person using the victim's phone was a black female due to the way she spoke.

Metro Police Detective William Stewart testified that he began investigating the death of the victim on April 5, 2007, and that he was the lead investigator. He said that the scene was secured when he arrived and that an ambulance had already left the scene to transport the victim to Vanderbilt Hospital. He said that other detectives searched the area for witnesses and spoke with Mr. Hines and Ms. Thomas before he arrived and that he knocked on doors to search for additional witnesses. He said he did not find additional witnesses that night. He said that he spoke with Ms. Thomas and Mr. Hines and that they informed him the victim likely rode a bus home from work and purchased a beer from a Phillips 66 convenience store before beginning his walk home. He identified a map of the area where the victim died and said it was a "very high crime area" where drugs were sold.

Detective Stewart testified that he attended the victim's autopsy the next day. He said that the medical examiner retrieved a bullet from the victim's lower bowel and that he took possession of the bullet and transferred it to the Tennessee Bureau of Investigation (TBI) for analysis. He identified a bag containing items recovered from the victim and said it contained a cigarette lighter, a bottle opener, and a pair of black shoes. He said that he also recovered clothing and a belt from the victim but that he did not find a wallet or a cell phone.

Detective Stewart testified that Ms. Thomas's father, Mr. Meadows, called him and that the conversation with Mr. Meadows convinced him the victim's death was related to drug activity. He said that he drove by the convenience store identified by Ms. Thomas and Mr. Hines as where the victim likely bought beer and that the manager told him the victim was not in the store on April 5, 2007. He said that he spoke with Ms. Price and Ms. Thomas later that day and that someone used the victim's cell phone to call Ms. Price.

Detective Stewart testified that he went to the Aquarium restaurant the next day and learned that Mr. Hines and Ms. Spurlock drove the victim home on April 5, 2007. He said he also checked bus schedules and learned that the victim would not have been able to take a bus home that night. He said he contacted Mr. Hines, Ms. Spurlock, and Ms. Thomas and learned that Mr. Hines drove the victim to North Second Street to purchase crack cocaine.

He said he was also told that Mr. Hines lost track of the victim and that Mr. Hines and Ms. Thomas searched for the victim and found him on the sidewalk. He said that he was told "Ty" was a possible person of interest but that he was not able to confirm whether the victim knew or spoke with anyone named Ty before his death.

Detective Stewart testified that he subpoenaed the victim's cell phone records. He said the records revealed that before the victim's death, his phone was used to call Charles Leggs at 10:51 p.m on April 5, 2007. He said the call duration was zero seconds. He said that he learned that Charles Leggs's middle name was Ty but that he did not speak with Mr. Leggs. He said that the victim's phone was used to call Wesley Reese before the victim died but that he was unable to determine who Mr. Reese was. He said that the victim's phone was used to call Will McCain and Edward Forte the morning after the victim's death and that he spoke with them but that they were unable to provide any useful information. He said that the victim's phone was used to call Laquana Moore, the Defendant's girlfriend, the morning after the victim's death and that he spoke with Ms. Moore. He said the victim's phone was used to call the victim's mother at 11:58 a.m. on April 6, 2007.

Detective Stewart testified that he returned to North Second Street a few days after the victim's death to canvass the area for information. He said that he came upon Kenneth Jerome Leggs and another man at a home near the scene and that he asked them if they had any information regarding the victim's death. He said that Mr. Leggs nodded affirmatively but that Mr. Leggs indicated he did not want to be a witness for the case and did not want his name used. He said he told Mr. Leggs he would not tell anyone if Mr. Leggs provided information. He said that he spoke with Mr. Leggs in his police cruiser and that based on the information provided, he began investigating the Defendant. He said that he saw the Defendant in the neighborhood surrounding the scene of the victim's death, that he saw the Defendant at Lillie Osborne's home on North Second Street, and that the Defendant was arrested at Ms. Osborne's home on April 18, 2007.

Detective Stewart testified that he interviewed Ms. Osborne after the Defendant was arrested and that she informed him that Demario Driver, Glen Howard, and Latarsha Ward may have witnessed the shooting. He said that he spoke with Mr. Howard on May 8, 2007, and that Mr. Howard was in jail at that time. He said that he had trouble locating Ms. Ward, that he interviewed her on August 25, 2008, but that the police were unable to locate her at the time of the trial.

On cross-examination, Detective Stewart agreed that he interviewed Kenneth Leggs at a home on North Second Street and that Mr. Leggs was homeless at the time. He agreed that he did not record either of the two interviews he conducted with Mr. Leggs and that he developed several suspects during his investigation, including Kelvin Mason, who Mr. Leggs

mentioned. He agreed that he interviewed Glen Howard but denied that he threatened to charge Mr. Howard with first degree murder unless Mr. Howard cooperated and made a statement. Detective Stewart did not remember telling Mr. Howard he would have to testify that he saw the shooting. Detective Stewart agreed that the area around North Second Street was a high crime area where drug transactions occurred and that he was told that several people were in the area on the night the victim was killed.

On redirect examination, Detective Stewart testified that he would not threaten to charge someone with murder unless the person agreed to testify at a trial. He said he did not record his interviews with Mr. Leggs because he initially told Mr. Leggs that he would not reveal his identity.

Kenneth Jerome Leggs testified that although he was incarcerated at the time of trial, his incarceration had nothing to do with the victim's death. He said that he lived on North Second Street in April 2007 and that he moved from house to house. He said the victim was an acquaintance whom he occasionally saw in the area around North Second Street. He said he knew the Defendant, Ms. Ward, and Tawan Leggs, who was his nephew. He said his nephew sold drugs to the victim.

Mr. Leggs testified that he was on North Second Street on the night the victim was shot. He said that he was sitting on a porch of a home at 1011 North Second Street with his girlfriend when he saw the victim. He said that a couple of men sat on the porch at a home next door, that Ms. Ward and Mr. Howard stood on the sidewalk a short distance up the street, and that other people were on the sidewalk selling drugs. He said the Defendant stood on the sidewalk a short distance from Ms. Ward and Mr. Howard. He said that drugs were often sold in the area and that he previously purchased drugs but that he did not sell drugs. He said Mr. Howard "sometimes" sold drugs in the area.

Mr. Leggs testified that the victim was alone when he saw him and that he spoke with the victim. He said the victim told him that he was "waiting on his people to come" and that he would wait at the home with Mr. Leggs until they arrived. He said that the victim and Ms. Ward spoke as the victim waited and that they discussed whether the victim wanted to purchase crack cocaine from the Defendant. He said the Defendant walked toward the house and sold crack cocaine to the victim. He said that the victim accused the Defendant of selling fake drugs and that the Defendant said "move around" and removed a silver revolver from his waistband. He said that he and his girlfriend moved inside the home when the Defendant pointed the gun at the victim. He said that the victim began walking away but that the Defendant shot him. He said that the victim's back was to the Defendant when he was shot and that about five or six feet separated the Defendant and the victim. He said that he initially thought the Defendant missed because the victim continued walking but that the

victim crossed the street and fell. He said he and his girlfriend locked the door to their house and left through the back door. He said that he only heard one shot and that he did not hear the victim say anything after he fell.

Mr. Leggs testified that he did not call the police after the shooting because he did not want to be involved. He said that his girlfriend planned to call the police at a neighbor's house but that they heard sirens before she could report the shooting. He said he did not speak with the police until they questioned him two or three days later. He said he told the police that he did not see or hear anything because he did not want to be involved. He said that although he did not want to speak with the police, he eventually told a detective that he witnessed the murder.

Mr. Leggs testified that Detective Stewart told him his name would not be used in association with the information he provided and that he hoped he would not be called to testify as a witness. He said that he was called as a witness at the preliminary hearing and that he was not a cooperative witness because he was angry about appearing as a witness. He admitted he testified at the preliminary hearing that he was intoxicated on crack cocaine and that he was too "high" to remember what happened on the night of the shooting. He said he stated those things at the preliminary hearing because he did not want to be involved. He said that he testified truthfully at the trial and that he was not threatened or promised anything in exchange for his testimony.

On cross-examination, Mr. Leggs admitted that he was "a liar and a thief." He agreed that although he stated during direct examination that he had known the Defendant for a couple of months, he testified at the preliminary hearing that he had known the Defendant all of his life. He agreed he stated at the preliminary hearing that he did not know who shot the victim, that multiple persons attempted to sell the victim drugs, that three persons fought that night, that he heard a gunshot as he stood at the side of his home and smoked crack cocaine, and that he saw three or four people run away. He agreed he told the judge at the preliminary hearing that he was drunk and high on crack cocaine. He agreed he stated at the preliminary hearing that his credibility was "worth nothing" because he was "a junky and a drunk." He said he lied at the preliminary hearing because he did not want to be involved with the trial. He said he told the truth during direct examination. He said that he underwent rehabilitation while he was incarcerated and agreed that he learned to be truthful.

Mr. Leggs admitted that he drank one-half pint of liquor and about three twenty-four ounce beers on the night of the shooting but stated he was not intoxicated. He agreed that three or four people stood on the street and sold drugs that night and that a few other persons were also near the street. He denied he had been smoking crack cocaine for four days at the

time of the shooting. He agreed that the police came to his home with their guns drawn and that they questioned him.

On redirect examination, Mr. Leggs testified that he had not started his rehabilitation at the time of the preliminary hearing and that he was angry about being forced to testify. He agreed he was declared a hostile witness at the preliminary hearing. He agreed he did not state at the hearing that the Defendant was absent from the scene during the shooting. He agreed he stated at the hearing that he did not see the Defendant shoot the victim. He said his testimony at the preliminary hearing was affected by his drug use and his desire not to be involved. He agreed the police were looking for the Defendant when they came to his home with their guns drawn.

On recross-examination, Mr. Leggs denied that he was smoking crack cocaine beside his home at the time of the shooting. He said he was a drug addict for fifteen years before being rehabilitated. He said he wanted the trial to be over to provide closure to people associated with the shooting.

Julianne Smith testified that she worked as a court officer and that she issued subpoenas for Judge Mark Fishburn. She said that on September 22, 2009, she mailed a subpoena to Laquana Moore at her home requesting that she appear at a pretrial conference on October 1. She said that she was present at the pretrial conference and that Ms. Moore did not appear. On cross-examination, Ms. Smith agreed that she mailed the subpoena to Ms. Moore using "regular U.S. mail." She said she did not know whether Ms. Moore received the subpoena.

Officer Chris Barnard testified that he was employed by the Tennessee Department of Correction and that he worked in Internal Affairs. His job duties involved examining telephone calls placed by inmates, and he examined calls made by the Defendant. He said the Defendant had a specific identification number associated with his telephone calls. He examined two telephone calls made by the Defendant and transferred the recorded calls onto a CD. He identified a CD containing the two calls that used the Defendant's identification number on May 22, 2009, and September 28, 2009. He said inmates submitted a list of telephone numbers and the persons associated with those numbers before they were allowed to place calls. He said the Defendant indicated that the telephone number he called on September 28 belonged to Ms. Moore. The calls were played for the jury.

In the call on May 22, 2009, the Defendant told a female that his trial was in October, and she stated, "I won't be there . . . cause they are trying to make me testify against you and I'm not." The Defendant responded, "So just don't show," and told the woman that he would inform her about the hearing afterward. In the call on September 28, 2009, Ms. Moore

asked the Defendant when he had to go to court. He responded that he had to go to court on the eighth and ninth. She stated, "So you don't go to court on the first?" He said no, explained that he had to go to court on the eighth and that he began trial on the twelfth, and asked if anyone contacted her. She stated that she received a subpoena in the mail ordering her to appear at a hearing on October 1, 2009, at 9:00 a.m. and that she would not attend the hearing. The Defendant stated, "Don't go. Please don't go. I don't give a damn what they say. . . don't even go over." He stated that "liars" were attempting to "pin" the case on him and that his attorney told him the State's witnesses could not testify that they saw him shoot the victim. He told Ms. Moore not to "feed them their lies." He then stated that he had not been thinking about his case. Ms. Moore stated that she missed the Defendant, and he responded that he missed her, too.

On cross-examination, Officer Barnard testified that although it was against policy, inmates sometimes exchanged their identification numbers when placing telephone calls. He could not say whether it happened frequently. He agreed he did not know who spoke in the recorded telephone calls that were played for the jury.

Laquana Moore testified that she was the Defendant's girlfriend at the time of the shooting in April 2007. She agreed that she had "Ms. Taylor" tattooed on her arm but said she was not married to the Defendant. She said that the Defendant came to her home the morning after the shooting, that he was shaking, and that he told her, "If anybody [comes] to you, tell them I was with you." She said she told the Defendant that he was not with her. She said she never asked the Defendant why he wanted her to say that she was with him. She said her father called her later that day, told her someone was murdered on North Second Street, and asked her if the Defendant was with her. She said the Defendant was not with her. She did not remember if she spoke with Detective Stewart.

On cross-examination, Ms. Moore testified that the Defendant "told me to lie for him and I told him I'm not going to lie for him." She said she did not remember when the Defendant came to her home and asked her to state that she was with him.

On redirect examination, Ms. Moore testified that she did not remember telling Detective Stewart that the Defendant came to her home in the early morning hours after the murder. She said that the Defendant called her while he was in jail and that he told her not to come to court. She agreed that she did not appear in court on October 1, 2009, after receiving a subpoena ordering her to do so. She said she did not appear because she was scared.

On recross-examination, Ms. Moore testified that she did not remember if she received a subpoena in the mail. She said that she planned to appear at the hearing but that

-11-

the Defendant told her not to go. She did not remember telling the Defendant in a telephone call that she did not plan to appear at the hearing.

Glen Howard testified that although he was incarcerated at the time of the trial, his incarceration had nothing to do with the victim's death. He agreed he had a record of criminal behavior, including convictions for selling drugs and aggravated assault. He said he was present when the victim was shot on April 5, 2007. He said that he and the Defendant sold drugs together and that he sold drugs at Ms. Osborne's home, located at 1103 North Second Street, just before the shooting. He said he knew Ms. Osborne because she smoked "dope" and allowed people to sell drugs from her home. He said the Defendant, Latarsha Ward, and a man named "Unc" were at Ms. Osborne's home before the shooting. He said that he did not speak with the Defendant before the shooting but that the Defendant sold drugs to Ms. Osborne that night. Mr. Howard said that he left the house around 11:00 p.m. or midnight and that he walked down the street to sell drugs. He said that he was four or five houses away from Ms. Osborne's home and that the Defendant also walked to the street.

Mr. Howard testified that he did not know the victim and that he first saw the victim on the night of the shooting. He said that the victim arrived in a car driven by a white man and that the car circled the block after the victim got out. He said that the victim asked him for drugs but that he did not have the amount requested by the victim. He said that the Defendant also did not have enough drugs to sell to the victim and that the Defendant asked him to combine their drugs to complete the sale to the victim. He said that he did not have any drugs and that he did not give any to the Defendant to sell to the victim. He said the Defendant walked to the victim and stated, "you know what it is," which meant that the victim should give the Defendant his money. He said the Defendant robbed the victim and then shot the victim as the victim walked away. He said the victim was shot in the back, near the side of his body. He said that he did not hear the conversation between the Defendant and the victim as the victim was robbed but that the Defendant did not say anything when he shot the victim. He said the victim fell and yelled for help.

Mr. Howard testified that he ran to Ms. Osborne's home after the shooting and that Ms. Osborne was at her home before and after the shooting. He said that the Defendant and Ms. Ward joined him at the home. He said he watched the Defendant remove shells from a gun, give them to Ms. Ward, and tell her to throw the shells in the trash. He said the Defendant also gave Ms. Ward the victim's cell phone and told her to throw it away. He said that he did not see the Defendant take the phone from the victim, that he left the house, and that he did not know if Ms. Ward threw away the shells or the phone.

Mr. Howard testified that he did not come forward to tell the police he saw the shooting. He said that Detective Stewart approached him and that he told the detective the

same information he told the jury. He said that he was not given anything in exchange for his testimony and that he was not threatened. He said he testified truthfully.

On cross-examination, Mr. Howard testified that the Defendant shot the victim with a black "six-shooter." He agreed he was convicted of criminal impersonation in 2004 and aggravated assault in 2008. He denied that the State rewarded him for his testimony, but he agreed that a condition of his plea agreement in the 2008 assault case was his continued cooperation with the police. He agreed that he sold drugs under the alias "J-Money" and that he used marijuana, crack cocaine, and alcohol. He denied being high when he saw the Defendant shoot the victim and said he did not use drugs or consume alcohol that night.

Mr. Howard agreed that he spoke with Detective Stewart in May 2007 and that he told Detective Stewart he "would do anything" to see his infant child. He agreed that Detective Stewart told him he would be charged with murder if he did not cooperate but denied that the detective threatened him. He denied Detective Stewart told him that "they" would help him if he stated the Defendant shot the victim but agreed he was led to believe that if he implicated the Defendant, the detective would "put in a good word" for him.

Mr. Howard agreed that he testified at previous proceedings and that he previously said the Defendant shot the victim in the stomach. He said that he was across the street when the Defendant shot the victim but that he could see the shooting because street lights were on. He said Ms. Osborne remained in her bedroom and did not enter the kitchen after the shooting.

On redirect examination, Mr. Howard agreed that he was not given a reduced sentence after being convicted of aggravated assault in exchange for his testimony regarding the victim's murder but that a condition of his probation required him to testify truthfully when called as a witness. He agreed he was not given any deal in exchange for his testimony. He agreed he stated at a preliminary hearing that the victim had his back to the Defendant and was turning to face the Defendant when he was shot. He agreed the Defendant shot the victim with a revolver capable of shooting six shots.

On recross-examination, Mr. Howard agreed that he stated at a preliminary hearing that he thought the victim was shot in the stomach as the victim turned to face the Defendant. He said he considered the side of the victim's torso to be a part of his stomach. He said the victim stood "sideways" when he was shot and had not completed his turn to face the Defendant.

Lillie Osborne testified that she lived at 1103 North Second Street with her two sons in April 2007. She admitted using drugs and said her home was a "dope house." She said

that the Defendant visited her home regularly and that he, Mr. Howard, and Ms. Ward came to her home on the night of April 5, 2007. She said the Defendant came to her home earlier that day, left, and returned around 10:30 or 11:00 p.m. She said the Defendant stayed at her home briefly before leaving with Ms. Ward and Mr. Howard. She did not know if they carried anything when they left. She said that about fifteen minutes after they left, she heard "cracking sounds like a pistol" and then "a great big boom, like a big gun." She said that she was in her bedroom when she heard the Defendant, Mr. Howard, and Ms. Ward return to her home and that the Defendant asked Ms. Ward to pick up shell casings that had fallen to the floor. She said that they left her home and that she did not know where they went. She said that Detective Stewart came to her home after the shooting and that she told him what she heard.

On cross-examination, Ms. Osborne testified that she, the Defendant, and Ms. Ward smoked crack cocaine at her home on the night of the shooting but that she did not know if Mr. Howard also used drugs that night. She said she drank a beer earlier that day but did not drink alcohol that night. She admitted she smoked crack cocaine several times a day around the time of the shooting. When asked when the shooting occurred, she said the victim was shot on the last day in March or the first day of April. She said that she heard more than one gunshot and that she heard several "cracking sounds" followed by a "big boom." She denied seeing Mr. Howard with a gun. She agreed that she was in her bedroom when the Defendant, Mr. Howard, and Ms. Ward returned to her home and that she did not see them enter her house. She said she knew who was in her home because she recognized their voices. She agreed that the Defendant, Mr. Howard, and Ms. Ward left her home at the same time but that she did not see them leave. She agreed she discussed her testimony with the prosecutor before the trial.

On redirect examination, Ms. Osborne testified that she recognized the Defendant's voice because he sold drugs from her home every day. She said that she asked the Defendant to stop selling drugs from her home but that he would not listen. She said that when she spoke with the prosecutor before the trial, she was told to tell the truth and was not told what to say. She said that she frequently heard gunshots near her home but that when she spoke with Detective Stewart, she knew to which night he was referring when he asked her about the victim's death. She said nothing indicated that Mr. Howard had a gun when the victim was shot.

On recross-examination, Ms. Osborne agreed that she did not know whether Mr. Howard had a gun. She agreed that she was given crack cocaine in exchange for allowing it to be sold from her home and that Mr. Howard sold drugs from her home. She said she heard more than two shots.

Dr. Thomas Deering testified as an expert in the field of forensic pathology. He stated that he was an assistant medical examiner with the State Medical Examiner's Office and that although he did not perform the autopsy of the victim, he reviewed all of the materials, reports, and results of the victim's autopsy. He said that Dr. Amy McMaster performed the autopsy but that she was not available to testify because she was out of state at the time of the trial. He said it was common for other medical examiners to testify if a specific examiner was unavailable.

Dr. Deering testified that the victim died from a gunshot wound to the abdomen. He said the victim was pronounced dead at 11:55 p.m. on April 5, 2007. He said that a bullet was found in the victim and that the victim was shot in his right flank just above his buttocks. He said that the bullet fractured the victim's hip bone and entered his abdomen and that the bullet moved from right to left inside the victim. He said he would not be surprised if there were little or no blood found at the scene because a large amount of blood was found in the victim's abdomen. He said the blood indicated that the victim bled to death within minutes after being shot. He said that soot and gunpowder were not found on the victim's skin and that he could not tell how far away the shooter stood.

Dr. Deering testified that benzoylecgonine was found in the victim's blood, which indicated the victim used cocaine. He could not identify how much cocaine the victim used, but he said it was used hours before the victim's death, not days. He said the victim's clothing and personal items accompanied the body when it was moved from the hospital to the medical examiner's office. He said a wallet and cell phone were not listed among the items recovered from the victim.

On cross-examination, Dr. Deering testified that a copper bullet was found in the victim and agreed that the victim was shot in the back. On redirect examination, Dr. Deering testified that the victim was shot on his right side and that the entry wound was closer to his back than to his front. He said the bullet found in the victim's abdomen was given to Detective Stewart.

The State read a stipulation signed by the defense. It stated that "on April 5, 2007, at approximately 7:36 p.m., the defendant fired a handgun at the location of 606 Main Street in Nashville Tennessee. The projectiles produced from the firing of that gun were recovered and entered into the Metro Nashville Police Department property room on Trinity Lane."

Metro Police Officer Felicia Evans testified that she was a crime scene investigator and that she responded to 606 Main Street at approximately 7:36 p.m. on April 5, 2007, after receiving reports of gunfire. She said other officers were at the scene when she arrived. She

said she recovered a projectile from the scene and identified an evidence bag and a property sheet listing the time and location where she found the projectile.

Detective Stewart was recalled and testified that on April 6, 2007, Dr. Amy McMaster gave him a projectile recovered from the victim. He said he logged the projectile in as evidence and submitted it to the property room. He identified an evidence bag and a property sheet listing the time and location where the projectile was found. He said he had the Tennessee Bureau of Investigation (TBI) compare the projectile recovered from the victim with the projectile Officer Evans recovered at 606 Main Street.

Detective Stewart testified that he had heard the Defendant speak on previous occasions and that he recognized the Defendant's voice. He said the Defendant was the male voice in the telephone calls that were played for the jury. He agreed that he interviewed Ms. Moore nine days after the murder and that she told him the Defendant woke her at her home around 1:00 a.m. on April 6, 2007.

On cross-examination, Detective Stewart testified that he never spoke with the Defendant on the telephone but that he listened to several calls made by the Defendant while he was in jail. He agreed that weapons frequently changed hands on the street and that it was possible that the weapon fired by the Defendant at 7:30 p.m. could have been given to someone else before the victim was shot later that night.

Metro Police Detective Paul Harris testified that he responded to 606 Main Street on April 5, 2007, after receiving reports of gunfire. He said he recovered a projectile from the scene and identified the projectile. He said he responded to a shooting on North Second Street later that evening. He said approximately two to three miles separated the locations of the two shootings.

TBI Agent Robert Daniel Royse testified as an expert in forensic firearm and tool mark identification. He said part of his job involved comparing markings on multiple bullets to determine if they were fired from the same gun. He said that every gun left unique imprints on the bullets it fired and that each bullet fired from a single gun would have the same "mechanical fingerprint" when viewed under a microscope. He identified three projectiles and said he was asked to determine if they were fired from the same gun. He said that the first bullet was submitted by Officer Evans and that the bullet was .38 or .357 caliber and had a full copper jacket, meaning it was not a hollow-point bullet. He said that the second bullet was submitted by Detective Stewart and that it was a .38 or .357 caliber, hollow-point bullet. He said that the third bullet was a .38 or .357 caliber, hollow-point bullet. He said each of the bullets was fired through the barrel of the same weapon.

Agent Royse testified that when a revolver is fired, the bullet cases remain in the gun until they are manually removed. He said that when a semiautomatic weapon is fired, the bullet cases are automatically ejected. He said the markings on the three bullets he examined were more consistent with being fired from a revolver than a semiautomatic weapon.

On cross-examination, Agent Royse testified that he did not know who fired the weapon. He said the caliber and markings left on the bullets indicated they were most likely fired through a revolver. He was aware that the National Academy of Sciences was commissioned to examine the state of forensic science in U.S. law enforcement and that it issued a report pointing out "problem areas" with training and recommending extensive reforms. He said the TBI laboratory exceeded all training requirements. He agreed ballistics matching is based on the theory that unique marks are left on a bullet by the barrel of a gun when it is fired. He agreed that two bullets fired from the same gun should bear reasonably identical markings and that determining whether two bullets were fired from the same weapon was subjective. He said every science except mathematics was subjective to some degree.

Agent Royse testified that he did not have the weapon used to fire the bullets in this case. He disagreed that more research was needed to quantify the probability of error in ballistics matching. He said that the TBI laboratory conducted proficiency tests once a year for the last fifteen years and that their error rate was zero, meaning that no one in the laboratory had ever misidentified a bullet on a proficiency test. He said the laboratory was audited each year by outside auditors. He disagreed that it was impossible to say the markings made on bullets were unique to a single weapon. He said that firearms identification had been performed for almost 100 years and that no two weapons had ever been found that produced the same unique markings on a bullet.

Agent Royse agreed that over an extended period of time, projectiles could change the markings on the inside of a gun barrel as they passed through, but he said that this would not lead to a misidentification but rather would cause him to be unable to identify that a particular bullet came out of a particular weapon. He agreed lead bullets and bullets with copper jackets could leave residue in a gun barrel and move old residue as they passed through. He said that although the residue could obscure the unique markings of the barrel, it would not change the markings. He said three consecutive barrels manufactured in the same machining process by the same machine would not have patterns that were close enough to fool a competent examiner. He said he performed studies with ten consecutively manufactured gun barrels and had no trouble identifying which bullet came from each barrel. He said adequately trained examiners would not misidentify the gun from which bullets had been fired. He was not aware of any tool mark examiners in Nashville who intentionally falsified reports.

On redirect examination, Agent Royse testified that the report issued by the National Academy of Sciences dealt with guidelines for properly training a firearms examiner and examined departments that did not meet the required standards. He said the TBI laboratory was not mentioned in the report. He said that the TBI laboratory was accredited by the American Society of Crime Laboratory Directors and by the Commission on Accreditation for Law Enforcement Agencies and that it did not have any of the deficiencies mentioned in the report.

Agent Royse testified that although there was not a quantifiable number for what constituted a match between different tool markings, there was a consensus among properly trained firearms examiners as to what constituted a match. He said that firearms examination was not totally subjective and that examiners followed specific guidelines based on scientific principles. He agreed that most sciences were partially subjective but that expertise and training helped to remedy differences in subjectivity. He agreed that examiners at his laboratory performed two blind proficiency tests per year and that the error rate on the tests was zero. He said that studies were performed at accredited laboratories across the nation and that most of the laboratories had error rates of zero. He said it would take "many, many consecutive shots" for bullet residue to produce any significant alteration of a gun barrel's markings. He said his examination of the three bullets in this case revealed that they were "definitely" fired through the barrel of the same gun.

On recross-examination, Agent Royse testified that he washed the bullet given to him by Detective Stewart because blood and tissue obscured the unique markings before he cleaned it. He said the blood and tissue would not change the markings.

Celeste Duke, the Defendant's mother, testified on behalf of the defense that on April 5, 2007, she was at Baptist Hospital between 9:00 and 11:00 p.m. because her other son had been shot eleven times. She said she left the hospital a little before 11:00 p.m. and rushed to purchase food from Church's Chicken, which closed at 11:00 p.m. She said she arrived home between 11:05 and 11:10 p.m. after being unable to purchase the food because the restaurant had just closed. She said the restaurant was about one block from her home. She said the Defendant, her husband, and daughters Teresa and Jwanna were at her home when she arrived. She said that the Defendant was watching television in the living room and that he made a mess on her table eating sandwiches and chips. She assumed he had been at her house for "a while" based on the mess.

On cross-examination, Ms. Duke agreed that she did not know where the Defendant was before she arrived home. She agreed her other son was not shot that day but said she rode with him and her daughter, Ms. Holt, to the hospital in an ambulance after he developed

a fever. She said her sister and a niece also went to the hospital. She said she did not inform the Defendant that his brother was in the hospital before she arrived home.

Ms. Duke testified that she arrived at Church's Chicken just as it closed, that it took her less than five minutes to drive home, and that she arrived home between 11:05 and 11:07 p.m. She said that the Defendant was sitting in the living room, that it appeared he just ate a sandwich and chips, and that tobacco on her table indicated he smoked a cigar. She said the sandwich was prepared using meat from her refrigerator but agreed she told an investigator that the Defendant had "leftover food wrappers and a drink cup" in front of him when she arrived home. She said the wrappers were the result of the Defendant's spreading the materials used to make his sandwich on the table.

Ms. Duke testified that the Defendant did not live at her home but that she gave him a key to her home after his brother was shot because family members visited the hospital and her home was near the hospital. She said that the Defendant left her home at 11:48 p.m. and that she remembered the time because she checked it on her television as he left. She did not know where the Defendant went or whether the Defendant went to Ms. Moore's home later that night.

Ms. Duke testified that she was positive she had not recently told the Defendant to stay away from her home. She denied she called the police a week after the victim was shot to have the Defendant removed from her home. She said she called the police after the Defendant fought with his brother. She was shown a police report and said the signature on it stating her name "could be" her signature, but she did not remember signing it. Although the police report stated she informed the police that she previously told the Defendant he was not welcome at her home, she denied making the statement.

Ms. Duke agreed that the prosecutor came to her home with Detective Stewart and Jan Norman on September 20, 2009, and asked her if she had information regarding the victim's death. She said that she was unable to speak at that time and that she told the prosecutor she needed to speak with her attorney and could possibly meet later in the week to discuss the shooting. She said her attorney advised her not to speak with the State outside of a courtroom.

On redirect examination, Ms. Duke testified that although she loved her son, she would not commit perjury for him. She said she testified truthfully.

Theresa Duke Swanson, the Defendant's sister, testified that her brother, Bobby, went to the hospital on April 5, 2007. She said that she did not go to the hospital and that she was at her mother's home between 9:00 and 11:30 p.m. She said the Defendant was at home

-19-

eating a sandwich when her mother arrived around 11:05 p.m. She said that her mother had just come from Church's Chicken but that she did not remember if her mother went to the hospital. When asked if her mother brought chicken home, she said yes but then said that her mother had "something" with her and that she did not remember if it was Church's fried chicken.

On cross-examination, Ms. Swanson testified that her mother arrived home after 11:00 p.m. but that she was not sure if it was 11:05 p.m. She agreed that despite it being a school day, she and her sister, Jwanna, stayed home all day. She said that her mother had a Church's Chicken bag with her when she arrived home but that she did not remember if her mother ate the chicken. She said the Defendant had been at the house for about forty-five minutes or an hour before her mother arrived. She said she opened the door for the Defendant when he arrived around 10:00 p.m. She agreed she spoke with defense counsel's investigator in September 2008. She did not remember telling the investigator that she did not hear the Defendant arrive at the house, that she did not remember what time he arrived, or that she only knew he was in the house because she heard him after he arrived. She did not remember failing to tell the investigator that she saw the Defendant at her mother's home or that she opened the door for the Defendant when he arrived.

Ms. Swanson agreed that she spoke with the prosecutor before the trial and that she told the prosecutor the Defendant arrived home at 10:00 p.m. She agreed she told the prosecutor that the Defendant was at the house for thirty to forty-five minutes and then left, but she said the Defendant was at home when her mother arrived. She did not remember telling the prosecutor that her mother came home before 10:30 p.m. She said she told the prosecutor the Defendant arrived home at "10:00 something," not 10:00 p.m., and stayed for thirty or forty-five minutes. She denied telling the prosecutor that the Defendant left no later than 10:45 p.m. She did not remember telling defense counsel's investigator that the Defendant was home for two hours before her mother arrived.

Ms. Swanson agreed that she opened the door for the Defendant because he did not have a key to his mother's home. She agreed that the Defendant had problems with her mother and that her mother did not want the Defendant "hanging around" the house. She agreed the only way the Defendant could enter the house was to be let in. She agreed her mother was incorrect when she testified that the Defendant had a key to the home. On redirect examination, Ms. Swanson agreed that she and the Defendant were at home when their mother arrived at 11:00 p.m.

Jwanna Duke, the Defendant's sister, testified that she was twelve years old at the time of the trial. She said she was at home all day on April 5, 2007. She said she, the Defendant, Ms. Swanson, and her sister, Brandy, were at home at 11:00 p.m. She said her

mother went to the hospital earlier that evening with Bobby and arrived home at 11:15 p.m. She said that the Defendant was there before her mother arrived and that he left when her mother got home around 11:00 p.m.

On cross-examination, Jwanna Duke testified that she did not attend school on Thursday, April 5, 2007, and instead spent the day at home. She said her mother knew that she and Ms. Swanson missed school to stay at home and watch television. She said that the Defendant arrived at the home at 9:00 p.m and that she remembered the time because she liked to "keep up with the time." She did not know what time she went to bed that night. When asked how the Defendant entered the house, she said, "With a key, I mean, no, he knocked on the door and my sister, Reesie, got up and answered the door." She said that she was sure the Defendant had a key to her home and that her mother allowed the Defendant to come and go as he pleased. She agreed her mother told the Defendant not to come to the house. She said the Defendant paced back and forth through the house after arriving and then made a sandwich. She said her mother arrived home at 11:15 p.m. Although she was not sure, she said her mother "probably" had chicken with her when she arrived home.

Jwanna Duke agreed that she spoke with defense counsel's investigator but did not remember telling him that she did not know when the Defendant arrived home, when her mother arrived home, or whether Ms. Swanson was at the home. She said that Ms. Swanson was at home when she went to sleep and that Ms. Swanson slept in the same bedroom. She did not remember telling defense counsel's investigator that Ms. Swanson spent the night at a friend's home. On redirect examination, Jwanna Duke testified that the Defendant had a key to the home and that he was there when her mother arrived.

On rebuttal, Officer Jeffrey Biggerstaff testified that he responded to a domestic disturbance at Ms. Duke's home on April 18, 2007. He said Ms. Duke informed him that she fought with the Defendant because she did not want him at her home and that the Defendant was near North Second Street if Officer Biggerstaff wanted to find the Defendant. He said his police report reflected that Ms. Duke told him she previously asked the Defendant to stay away from her home.

Al Gray testified that he was employed by the District Attorney's Office as a criminal investigator. He agreed he went with prosecutors to speak with Ms. Swanson. He said Ms. Swanson told them that the Defendant arrived home at 10:00 p.m. on April 5, 2007, that the Defendant stayed for thirty-five to forty-five minutes, and that the Defendant left the home no later than 10:45. On cross-examination, Mr. Gray agreed that Ms. Swanson told him the Defendant did not leave the home until after his mother arrived.

Roger Clemons testified that he was hired by the defense as a criminal investigator. He agreed he interviewed Jwanna Duke on September 2, 2008. He agreed she told him that she did not know when her mother arrived home on April 5, 2007, and that she was not sure if Ms. Swanson was at the home that night. He agreed she did not tell him what time the Defendant left the home.

Upon this evidence, a Davidson County Criminal Court jury convicted the Defendant of felony murder, second degree murder, and especially aggravated robbery. The trial court merged the convictions for felony murder and second degree murder and sentenced the Defendant as a Range III, multiple offender to life for felony murder and to forty years' confinement for especially aggravated robbery, to be served concurrently with each other and consecutively to the Defendant's sentence in another case. This appeal followed.

**I**

The Defendant contends that the evidence was insufficient to support his convictions because Mr. Leggs, Mr. Howard, and Ms. Osborne lacked credibility and the defense witnesses were credible. The State contends that the evidence was sufficient to support the convictions and that questions regarding witness credibility were resolved by the jury. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As applicable to this case, a person commits felony murder if he or she kills another "in the perpetration of or attempt to perpetrate any . . . robbery . . . ." T.C.A. § 39-13-202. Second degree murder is a knowing killing of another. T.C.A. § 39-13-210. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. T.C.A. §§ 39-13-401 (2010), -403. "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(18) (2006) (amended 2009). "[A] person acts

knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(20).

Taken in the light most favorable to the State, Mr. Shanklin testified that on April 5, 2007, the victim left work at 10:24 p.m. with a couple thousand dollars in his wallet. Mr. Hines testified that he drove the victim to North Second Street for the victim to purchase crack cocaine and that the victim left the car holding his cell phone. He said he lost sight of the victim when the victim walked around the corner and entered a person's yard.

Kenneth Leggs testified that he was on North Second Street on the night the victim was shot. He said that the victim and Ms. Ward discussed whether the victim wanted to purchase crack cocaine from the Defendant and that the Defendant sold crack cocaine to the victim. He said that the victim accused the Defendant of selling fake drugs and that the Defendant said "move around" and removed a silver revolver from his waistband. He said that the victim began walking away but that the Defendant shot the victim in the back.

Mr. Howard testified that he was present when the victim was shot on April 5, 2007. He said the Defendant, Latarsha Ward, and a man named "Unc" were at Ms. Osborne's home before the shooting. He said the victim was in the area to purchase drugs. He said the Defendant walked to the victim and stated, "you know what it is," which meant that the victim should give the Defendant his money. He said the Defendant robbed the victim and then shot the victim with a black "six-shooter" as the victim walked away. He said that he ran to Ms. Osborne's home after the shooting and that the Defendant and Ms. Ward joined him at the home. He said he watched the Defendant remove bullet shells from the gun, give them to Ms. Ward, and tell her to throw the shells in the trash. He said the Defendant also gave Ms. Ward the victim's cell phone and told her to throw it away.

Ms. Osborne testified that the Defendant, Mr. Howard, and Ms. Ward came to her home on the night of April 5, 2007. She said that they left and that about fifteen minutes later, she heard "cracking sounds like a pistol" and then "a great big boom, like a big gun." She said that she was in her bedroom when she heard the Defendant, Mr. Howard, and Ms. Ward return to her home and that the Defendant asked Ms. Ward to pick up shell casings that had fallen to the floor.

Ms. Moore testified that the Defendant came to her home the morning after the shooting, that he was shaking, and that he told her, "If anybody [comes] to you, tell them I was with you." She said she told the Defendant that he was not with her. She said the Defendant "told me to lie for him and I told him I'm not going to lie for him."

-23-

Ms. Thomas testified that the victim's personal items were given to the police after he died and that the victim's cell phone and wallet were missing. She said the victim always carried a wallet. Detective Stewart testified that he did not recover a wallet or a phone from the victim. He said that the victim's phone was used the morning after the victim's death to call the Defendant's girlfriend and the victim's mother. Ms. Price testified that a black female called her from the victim's phone on April 6 but that the caller quickly hung up.

Dr. Deering testified that the victim was shot in his right flank just above his buttocks and that a bullet was found in the victim. He said the bullet was transferred to Detective Stewart. The Defendant stipulated that "on April 5, 2007, at approximately 7:36 p.m., the defendant fired a handgun at the location of 606 Main Street in Nashville, Tennessee. The projectiles produced from the firing of that gun were recovered and entered into the Metro Nashville Police Department property room on Trinity Lane." Detective Stewart said he had the TBI compare the projectile recovered from the victim and the projectile recovered at 606 Main Street. Agent Royse testified that the bullets were fired through the barrel of the same weapon and that the caliber and markings left on the bullets indicated they were most likely fired through a revolver.

We conclude that a rational trier of fact could have found the elements of felony murder, second degree murder, and especially aggravated robbery beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

**II**

The Defendant contends that the trial court erred by admitting evidence of prior bad acts when it allowed evidence that he fired a gun at 7:36 p.m. on April 5, 2007. He argues that the evidence was not admissible to prove identity because the earlier shooting and the shooting of the victim were not substantially similar "signature crimes" from which identity could be inferred. He also argues he was forced to stipulate that he fired a handgun hours before the victim was shot because the trial court previously granted the State's pretrial motion to introduce the evidence pursuant to Tennessee Rule of Evidence 404(b). The State argues that the Defendant agreed to the stipulation before the court ruled on the pretrial motion and that the trial court did not err by allowing the stipulation to be introduced. We hold that the trial court did not abuse its discretion by admitting the evidence.

Tennessee Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243

(Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Before the trial, the State filed a notice of intent to introduce proof that the Defendant fired a weapon four hours before the victim was shot, that the police recovered projectiles from the previous shooting, and that the projectiles matched the projectile recovered from the victim. The State argued that it wanted to submit the evidence to establish identity and the fact that the Defendant was in possession of the gun used to shoot the victim only hours before the victim was shot and less than two miles from where the victim was shot. The Defendant filed a response in which he argued that the evidence was inadmissible because the earlier shooting and the shooting of the victim were not substantially similar "signature crimes" from which identity could be inferred.

At the pretrial hearing, the State informed the trial court that it sought to introduce the evidence because the issue of identity would be contested at trial. It noted that the witnesses who would testify that the Defendant shot the victim would have their credibility questioned on cross-examination due to their criminal records and established drug use. At the hearing, defense counsel stated, "I think all the jury needs to know and needs to be put into evidence is that a crime was committed and it was committed with this weapon, and this weapon was in the possession. They can show that the weapon was in possession of [the Defendant]." Although the State argues that this statement shows that the Defendant agreed to the stipulation before the court ruled on the pretrial motion, no stipulation was made during the

pretrial hearing, and the stipulation contained in the record does not list the date it was made. The trial court found that the evidence was probative of identity but stated that it wanted to consider the issue before ruling on the admissibility of the evidence. After the hearing, the trial court issued an order finding that the identity of the Defendant as the perpetrator of the shooting and robbery was a material issue and that clear and convincing evidence established the Defendant committed the previous shooting. The trial court restricted the admissibility of the evidence to limit any prejudicial effect and prohibited the State from establishing that the Defendant fired the shots during an attempted robbery or that a victim was involved in the earlier shooting.

The Defendant argues that the evidence was not admissible to prove identity because the earlier shooting and the shooting of the victim were not substantially similar "signature crimes" from which identity could be inferred. He cites Bunch v. State, 605 S.W.2d 227 (Tenn. 1980), in support of his claim. In Bunch, our supreme court stated that

> if evidence that the defendant has committed a crime separate and distinct from the one on trial, is relevant to some matter actually in issue in the case on trial and if its probative value as evidence of such matter in issue is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted . . . When evidence that the defendant committed another crime is offered to prove his identity as the perpetrator of the crime on trial, the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged.

Id. at 229-30. To determine whether certain crimes are substantially identical and permit an inference of identity, "the test is not whether there was evidence that a defendant committed both crimes, but whether there was a unique method used in committing the crimes." Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978). We note that unlike the evidence of a previous robbery admitted in Bunch, the evidence here did not establish that the Defendant committed another crime. The stipulation stated only that the Defendant fired a handgun and that projectiles were recovered and transferred to the police department's property room. The stipulation did not state that the Defendant shot Edward Scott during an attempted robbery, and no evidence submitted at trial established that the shots were fired during the commission of a crime or that firing a gun constituted a crime itself. In any event, the record reflects that the same handgun was used during both shootings.

-26-

Furthermore, our courts have consistently permitted proof establishing that a defendant previously possessed and used a weapon that was subsequently used to commit the criminal offense for which he or she was on trial. In <u>State v. Howell</u>, our supreme court held that evidence establishing the defendant previously shot a woman with the same gun that was used to shoot the victim was relevant and admissible to prove identity. 868 S.W.2d 238, 254-55 (Tenn. 1993). In <u>State v. McKay</u>, the court held that evidence establishing the defendants used a weapon during a previous robbery was relevant and admissible to prove the defendants' identity and possession of the weapon they used in a subsequent murder. 680 S.W.2d 447, 452 (Tenn. 1984). Similarly, in <u>State v. Taylor</u>, this court held that evidence establishing that the defendant shot a man two months after the instant offense was admissible to prove identity when the bullets recovered from the subsequent shooting matched bullets recovered from the victim and when there were no eyewitnesses to the victim's murder. 669 S.W.2d 694, 697-98 (Tenn. Crim. App. 1983).

We agree with the trial court that the evidence was probative because it helped to establish the identity of the Defendant as the victim's shooter, a material issue other than conduct conforming with a character trait. We also conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The credibility of the eyewitnesses identifying the Defendant as the shooter was subject to attack, and any prejudicial effect of the evidence was tempered by the trial court's order prohibiting the State from establishing that the Defendant fired the shots during an attempted robbery or that a victim was involved in the earlier shooting. We conclude that the trial court did not abuse its discretion by admitting the evidence. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE